IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| DONNIE SHROPSHIRE, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 10-00470-CB-N |
| CHANDRA JOHNSON, | ) | |
| | ) | |
| Defendants, | ) | |

**ORDER**

On January 12, 2015, this matter came before the Court for a bench trial on the Plaintiff's claim that Defendant used excessive force in violation of the Eighth Amendment and 42 U.S.C. § 1983.  After due consideration of the witnesses and evidence presented the Court enters the following findings of fact and conclusions of law.

*Findings of Fact*

On July 4, 2010, Plaintiff Donnie Shropshire, an Alabama prison inmate, was incarcerated at the Atmore Work Release Center, a correctional facility operated by the Alabama Department of Corrections (ADOC).  Shropshire was working as a runner for the defendant, Sgt. Chandra Johnson, an ADOC correctional officer.  Early that morning Shropshire carried a computer to the dining hall to be used for visitation.  As Shropshire approached the entrance, another inmate opened the door

and squeezed liquid from a squeegee outside the door, soaking Shropshire's right foot. Immediately, his foot began to burn and itch. Shropshire went to Johnson and told her that his foot was burning and itching. Johnson replied, "Bull [Shropshire's nickname], I need you." Shropshire took off his sock but put his wet shoe back on and continued with his duties. When his duties ended around 2:00 p.m., Shropshire took a shower. At that point the top of his right foot was very red and continued to itch and burn.

The following morning, Monday, July 5th, Shropshire's foot was in pain and a large blister "bigger than a 50-cent piece" had developed on the top of his foot. At this point, Shropshire categorized his pain as an "8 or 9 out of 10." The foot was so swollen that Shropshire could not get his shoes on. Shropshire described his big toe as being the "size of two thumbs." Two blisters had developed on the top of his foot, each the size of a 50-cent piece, about half an inch high, and filled with fluid. Shropshire could not work that day because of the pain, which he described as "pulsating" and as an "8 or 9" out of 10. He put in a "sick call slip" requesting medical treatment for his foot.

The primary factual dispute in this case centers on the events of July 6th. That morning Shropshire was called to the kitchen. At this point, his foot was even more swollen than the day before. He had to drag his foot when he walked because could not bend it. He was wearing shower slides, and had cut the top so that he could get it on his swollen foot. Shropshire went to the kitchen and reported to Steward Stonewall, who was in charge. He told her he could not work and showed her his foot. Stonewall asked, "What's wrong with your foot? You got gout?" Also

present in the kitchen, according to Shropshire, were Steward English, Inmate Jerome Fletcher, and Sgt. Johnson.  Shropshire was standing just a few feet from Stonewall as he was talking with her and showing her his foot.  Stonewall told Johnson to go back to his bunk.

According to Shropshire's testimony, when he started to leave, Sgt. Johnson, who had been standing a couple of feet behind Stonewall, took a squeegee from Inmate Fletcher, who was mopping the floor.  Johnson took the squeegee in both hands and intentionally "bammed" it down on Shropshire's injured foot.  The impact caused the blisters to burst, oozing blood and fluid.  Shropshire described the pain he felt at that time as "excruciating."  The pain was so bad that it made him cry, and he hurried out the door so that he would not react in front of Johnson.  After the blow, Shropshire's foot hurt worse than before.  According to Shropshire his pain level was "at least" 10 out of 10.  Shropshire further testified that when Johnson struck his foot, she had a look on her fact that said "Obey."

Johnson testified that that she did not remember how Shropshire's foot was injured, that she never had a conversation with Shropshire on July 4th about his burning foot and his wet shoe, and denied ever striking Shropshire with a squeegee.  She did admit to being in the kitchen in the course of her duties on July 6th.  According to Johnson, the first time Shropshire's injury came to her attention was on the morning of July 7th when Shropshire was brought to the duty office in a wheelchair by Inmate McGaster.  Johnson called the medical office at nearby Fountain Correctional and spoke with a nurse about Shropshire, then had another officer take Shropshire to the infirmary at Fountain.

3

Shropshire's injury was a serious one. He was admitted to the infirmary ward at Fountain, where he stayed for approximately two to three weeks. He was diagnosed with a chemical burn and a penicillin-resistant strain of staph infection known as MRSA. After a month of treatment consisting of intravenous and/or intramuscular antibiotics, pain medication, and wound care, Shropshire's foot was healed, according to his medical records and the testimony of his health care providers.[1] There is no medical evidence that the single blow to Shropshire's foot caused either the staph infection or any other injury that necessitated the treatment Shropshire received or his stay in the infirmary.

Ultimately, the Court finds Shropshire's testimony regarding the incident to be more credible. First, Johnson's memory was very selective. She clearly remembered events that showed her in a favorable light, such as helping Shropshire earn him extra benefits because he had no family support and moving him to a bottom bunk when one became available.[2] Yet, she did not recall anything about Shropshire's injury, even though she admitted (and others similarly testified) that Shropshire was not one to remain quiet when he had a problem. In addition, Johnson was less than forthcoming when her attitude about Shropshire's homosexuality was questioned. From Shropshire's testimony, it appeared that Johnson was morally opposed to homosexuality and that her opposition affected her

---

[1] Dr. Oscar Lopez and Nurse Practitioner Barry Gaston testified by deposition.

[2] Johnson also insisted that she called a nurse "every time" a prisoner complained to her about a medical problem. Yet when questioned further by the Court, Johnson admitted that she called a nurse "every time " if something serious is involved, like shortness of breath or bleeding.

4

attitude toward Shropshire.[3]  Johnson, who is a lay minister, insisted that she had no religious problem with homosexuality, but when questioned further she admitted that her church "believe[s] that sin is morally wrong" and that "homosexuality is a sin."  Finally, Johnson was unduly evasive when it came to admitting knowledge of Shropshire's injury.  First, she said that when he was brought to the duty office of July 7th he was wearing a sock, that she did not see his foot, and that she was told that there was "blood and stuff."  On cross examination, Johnson admitted that Shropshire's foot was not in a sock but was wrapped (which was consistent with the makeshift bandage Shropshire described).

    The Court also finds Shropshire's version more credible for other reasons.  Shropshire, who is a 57-year-old inmate serving life, testified that he had never before filed a lawsuit and thus has no history of frivolous actions.  Furthermore, there is little motivation to lie about the incident, which was never the primary focus of this lawsuit.[4]  Moreover, defense counsel's attempts to discredit Shropshire were not successful.  Shropshire was disciplined once by Johnson, but he admitted to the infraction, which was minor, and the discipline imposed had little effect on Shropshire.  Shropshire may not have told medical staff that Johnson hit him (although he claimed to have secretly told Dr. Lopez).  However, as he explained,

---

[3] Shropshire testified Johnson did not like other inmates calling him "Mama Bull" in reference to his homosexuality, that she once put holy oil on his head and said "The devil is alive," that she "got on him" about his voice (because it was not manly enough), and told him to be a man because God did not put him on the earth to be like he was.  Furthermore, both Johnson and J. C. McGaster testified that Johnson put the homosexual prisoners in a separate dormitory during the time they were at Atmore Work Release Center.

[4] Shropshire's predominant complaint was the delay in medical care.  Summary judgment was granted in favor of the defendants on that claim.

there are guards in the infirmary.  Therefore, is understandable that Shropshire would not have publicly accused a guard of misconduct.  Finally, why would Shropshire fabricate an incident with two prison employees (Steward Stonewall and Steward English) as witnesses?

### *Conclusions of Law*

Based on the foregoing facts, the Court finds by a preponderance of evidence that Johnson has violated Shropshire's constitutional right, guaranteed by the Eighth Amendment, to be free from cruel and unusual punishment and is liable for damages under 42 U.S.C. § 1983.

> To establish an Eighth Amendment violation a prisoner must prove that his injury was caused by an "unnecessary and wanton infliction of pain." The Supreme Court has admonished that in such cases "the core judicial inquiry is … whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  The absence of "serious injury" alone is insufficient to dismiss a prisoner's Eight Amendment claim. *Id.* Instead, analysis of an Eighth Amendment excessive force claim is contextual and requires that many factors be considered: "the need for the application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response."

*Harris v. Chapman*, 97 F.3d 499, 505 (11th Cir. 1996) (quoting *Hudson v. McMillian,* 503 U.S. 1, 5, 7 (1992)).  However, "[not] every malevolent touch by a prison guard gives rise to a federal cause of action."  *Hudson*, 503 U.S. at 9.   Thus, "*de minimis* uses of physical force" are not prohibited "'provided that the use of force is not of a sort repugnant to the conscience of mankind.'"  *Id.* at 10 (quoting *Whitley v. Albers,* 475 U.S. 312, 327 (1986)).

6

Viewed in context, Johnson's use of force was excessive because striking Shropshire's obviously injured and painful foot was malicious, gratuitous, and without justification or provocation.  As the Supreme Court stated in *Hudson v. McMillian*, 503 U.S. at 9, "[w]hen prison official maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated.  This is true whether or not significant injury is evident."  Even if the force used to strike Shropshire might be considered minor in other circumstances, the act of deliberately striking a prisoner's injury solely for the purpose of inflicting pain is nothing short of malicious.  The Court has no doubt Johnson was aware of the injury to Shropshire's foot when she hit him.  Shropshire complained to her when his foot was first injured, and she overheard the conversation between Shropshire and Steward Stonewall immediately before she struck Shropshire.  Furthermore, Johnson's blow caused significant pain and contributed to the severity of the injury. Shropshire testified that the pain was a 10 out of 10 and that he had to leave the area so that he would not react against Johnson. The blow caused an open wound, and, according to medical testimony, open wounds increase the risk of infection. In sum, Johnson's wanton and unnecessary infliction of pain amounts to cruel and unusual punishment.

Having decided the issue of liability, the Court must determine damages.  In a § 1983 lawsuit, a plaintiff may be entitled to recover both compensatory and punitive damages.  Compensatory damages include "damages based on monetary loss, physical pain and suffering or demonstrable mental and emotional distress." *Slicker v. Jackson*, 215 F.3d 1225, 1233 (11th Cir. 2000).  Shropshire undoubtedly

suffered mental and emotional distress due to the chemical burn, MRSA infection, and subsequent treatment. But these are not attributable to the squeegee incident and, therefore, are not compensable. Damages will, however, be awarded for the increase in pain and suffering and emotional distress resulting from the incident. Shropshire testified that the pain was worse after the blow, was "excruciating," and was "at least" a 10 out of 10. In addition, Shropshire testified that blow caused an emotional reaction strong enough to make him cry. Altogether, the Court finds that $1,000 is an adequate and appropriate award for physical pain and suffering and mental and emotional distress.

Next, the Court turns to punitive damages. In general, punitive damages may be awarded for a violation of § 1983 "when when the defendant's conduct is shown to be motivated by evil motive or intent," i.e., is malicious, or "when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). Having determined that Johnson's conduct was malicious, the Court has no difficulty concluding that Shropshire has met the threshold necessary for an award of punitive damages. However, the inquiry is more complicated here.

In an Eighth Amendment excessive force case, an award of punitive damages is governed by the Prison Litigation Reform Act (PLRA), 18 U.S.C. § 3626(a)(1)(A). *Johnson v. Breeden*, 280 F.3d 1308, 1323-24. The PLRA strictly limits the availability of "prospective relief" which it defines as "'all relief other than compensatory money damages.'" *Id.* at 1324 (quoting 18 U.S.C. § 3626(g)(7)). Thus, for PLRA purposes, punitive damages are considered prospective relief and must be "narrowly drawn,

8

extend[ ] no further than necessary to correct the violation of the Federal right, and must be the "least intrusive means necessary to correct the violation." *Id.* 18 U.S.C. § 3626(a)(1)(A). Furthermore, "[t]he court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." *Id.* The district court is required to discuss and enter findings with respect to these factors, even though "there may not be much to say about the[m]." *Johnson*, 280 F.3d at 1326.

The Court finds that a punitive damages award in the amount of $1,000 is appropriate and satisfies the foregoing criteria. Punitive damages serve the dual aims of punishment and deterrence. *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408 (2003). This modest award goes no further than is necessary to serve those goals and could not be more narrowly drawn or less intrusive. Moreover requiring an officer who intentionally violated a prisoner's constitutional rights to pay a small punitive damages award should not have a significant adverse impact on public safety or the operation of a criminal justice system.

**Conclusion**

For the foregoing reasons, the Court finds in favor of the Plaintiff and awards compensatory damages in the amount of $1,000 plus punitive damages in the amount of $1,000. Judgment will be entered by separate order.

As the prevailing party, the Plaintiff may be entitled to "a reasonable attorney's fees as part of the costs." 42 U.S.C. § 1988(b). Plaintiff shall file a properly supported motion for attorney's fee and costs on or before **February 13,**

2015.  Defendant must file its opposition to the motion on or before **February 27, 2015.**

    **DONE** and **ORDERED** this the 21st day of January, 2015.

                                   **s/***Charles R. Butler, Jr.*
                                   **Senior United States District Judge**